UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action Number:

RICHARD POHLY,

    Plaintiff,

v.

INTUITIVE SURGICAL, INC.,

    Defendant.

_____

**INTUITIVE SURGICAL, INC.'S MOTION TO MODIFY
PLAINTIFF'S SUBPOENAS TO ENCISION, INC.**
_____

Defendant Intuitive Surgical, Inc. ("ISI") brings this Motion to Modify Subpoenas issued by Plaintiff Richard Pohly to non-party Encision, Inc. ("Encision"). ISI is the defendant in a products liability case brought by Richard Pohly in the Northern District of California, case number 5:15-cv-04113 MEJ (the "Underlying Lawsuit"). Plaintiff's subpoenas are overbroad and seek the disclosure of ISI's protected trade secrets and confidential commercial information not relevant to the claims at issue in the Underlying Lawsuit. Accordingly, ISI respectfully requests that this Court modify the subpoenas to limit the deposition topics and document requests as described below.

**Statement of Local Civil Rule 7.1 Compliance**

The parties met and conferred on November 2, 2016, regarding the subject of this motion but were unable to reach agreement on the issues that are the subject of this motion.

1

## I.     STATEMENT OF FACTS

ISI is a medical device company that designs, manufactures, and sells a robotic surgical system called the *da Vinci* Surgical System (the "*da Vinci*") that is used in laparoscopic surgeries. The Underlying Lawsuit arises out of Mr. Pohly's post-operative complications from his July 31, 2012 robotically-assisted laparoscopic prostatectomy performed using the *da Vinci* Si surgical system. The *da Vinci* uses computer-enhanced technology to translate the hand motions of a surgeon into precise micro-movements by laparoscopic instruments inside the patient. ISI also manufactures and sells *EndoWrist* instruments and accessories for the *da Vinci*. Mr. Pohly alleges that he suffered a rectal perforation caused by a monopolar curved scissor ("MCS") instrument manufactured by ISI that allegedly malfunctioned during his surgery. (Declaration of Galen D. Bellamy ("Bellamy Decl."), Ex. 1 (Compl.), ¶¶ 13, 22, 69.) Mr. Pohly alleges that his rectal injury was caused by "sparks" that escaped microcracks that could develop in the MCS following reprocessing. (Compl. ¶¶ 20, 22.) ISI discovered this potential microcracking issue and issued a recall notice in May 2013. (*Id.* ¶¶ 22, 67.)

Since it obtained clearance from the FDA in 2000, ISI has brought several lines of *da Vinci* surgical systems to market: the *da Vinci* standard, the *da Vinci* S, the *da Vinci* Si, and most recently in 2014, the *da Vinci* Xi. (Stoffel Decl. ¶ 4.) Each line of surgical system has its own instruments – for example, *EndoWrist* instruments designed and sold for the Xi line are incompatible with the Si line.[1] (*Id.*) ISI's records and the instrument and accessories log from Plaintiff's prostatectomy confirm that an 8mm MCS, version number 420179-10 was used in Mr. Pohly's surgery on the *da Vinci* Si system. (*Id.*, ¶ 5.) The allegations in Plaintiff's Complaint focus on the 8mm MCS. (Bellamy Decl., Ex. 1 ¶¶ 19–22.)

---

[1] Many instruments for the *da Vinci* S are compatible with the *da Vinci* Si system.

2

Plaintiff alleges, among other things, that ISI should have incorporated Active Electrode Monitoring ("AEM") into the MCS instrument used in Mr. Pohly's prostatectomy to improve its safety. (*Id.*, ¶¶ 23-24). Encision, the third-party company to whom Plaintiff directed his subpoenas, is the manufacturer of monopolar laparoscopic instruments with AEM technology. (*Id.*, ¶ 42.) In March 2009, ISI and Encision entered into a Manufacturing, Supply and License Agreement (the "Encision License Agreement") to work on incorporating AEM technology into a new ISI surgical system and instrument line (the "Single-Port line"). (Bellamy Decl., Ex. 2.) During the term of the Encision License Agreement, the parties exchanged confidential and proprietary information relating to each other's business practices, strategies and technologies. (*Id.* at p. 15.) None of the surgical system or instruments for the Single-Port line have been released for sale and the line is still under development. (Stoffel Decl. ¶ 7.) It is undisputed that the Single-Port surgical system and instrument line were not used in Plaintiff's surgery.

    A.    **Procedural History**

On October 26, 2012, Plaintiff propounded a subpoena to testify at a deposition and a subpoena to produce documents to Encision, Inc. in Boulder, Colorado. (Bellamy Decl. Exs. 3, 4.) Plaintiffs issued 8 topics, all of which are objectionable as demonstrated in the table below:

| Topic | Objection |
| --- | --- |
| 1. Any agreements with Intuitive Surgical, Inc. that refer or relate to the licensing or other use of Encision's Active Electrode Monitoring Technology. | Overbroad as to scope and time; seeks trade secret or other confidential research, development or commercial information |
| 2. The persons employed by or representing Intuitive Surgical, Inc., and Encision, Inc., who communicated with regard to Intuitive's purchase of the right to use AEM technology. | Overbroad as to scope and time |

3

| | |
|---|---|
| 3. What Intuitive surgical [sic] asked Encision about the incorporation of AEM technology into the da Vinci robotic system between prior to [sic] May 2013, and what Encision told Intuitive in response. | Overbroad as to scope; seeks trade secret or other confidential research, development or commercial information |
| 4. What Intuitive Surgical told Encision about Intuitive's evaluation of Active Electrode Monitoring technology and the place of AEM technology in robotic surgery, prior to May 2013. | Overbroad as to scope; seeks trade secret or other confidential research, development or commercial information |
| 5. The feasibility of incorporating Active Electrode Monitoring technology into Intuitive's Monopolar Curved Scissors prior to May 2013. | Overbroad as to scope; seeks trade secret or other confidential research, development or commercial information |
| 6. What Intuitive told Encision about the feasibility of incorporating Active Electrode Monitoring technology into Intuitive's Monopolar Curved Scissors prior to May 2013. | Overbroad as to scope; seeks trade secret or other confidential research, development or commercial information |
| 7. Encision's understanding of Intuitive's reasons for choosing not to incorporate Active Electrode Monitoring technology into Intuitive's Monopolar Curved Scissors prior to May 2013. | Overbroad as to scope; seeks trade secret or other confidential research, development or commercial information |
| 8. Whether Intuitive currently uses any Encision technology in **any version, design or production, of its robotic surgery system.** | Overbroad as to scope and time; seeks trade secret or other confidential research, development or commercial information |

Ex. 3 (emphasis added).

Notably, Topic No. 8 expressly seeks information pertaining to robotic surgical systems under design or production at present, more than 4 years after the date of Mr. Pohly's surgery.

4

Each of Plaintiff's 6 document requests are also overbroad:

| Topic | Objection |
| --- | --- |
| 1. All agreements with Intuitive Surgical, Inc., that refer or relate to the licensing or other use of Encision's Active Electrode Monitoring Technology. | Overbroad as to scope and time; seeks trade secret or other confidential research, development or commercial information |
| 2. All communications with Intuitive Surgical related, Inc., [sic] to the incorporation or use of Active Electrode Monitoring technology in **any da Vinci robotic system**. | Overbroad as to scope and time; seeks trade secret or other confidential research, development or commercial information |
| 3. All internal Encision communications (including emails) prior to May 2013 reflecting or referring to statements made by any employee or representative of Intuitive Surgical regarding or relating to Active Electrode Monitoring technology. These emails may be redacted so that only the statements by Intuitive are provided. Alternatively, Encision can provide a list of the statements in question, along with the date and author of the Intuitive employee or representative making the statement, if known. | Overbroad as to scope; seeks trade secret or other confidential research, development or commercial information |
| 4. All documents related to the feasibility of incorporating Active Electrode Monitoring technology into **any Intuitive instrument**, including Monopolar Curved Scissors. | Overbroad as to scope and time; seeks trade secret or other confidential research, development or commercial information |
| 5. All design drawings for **any version of Intuitive's Monopolar Curved Scissors** provided to Encision. | Overbroad as to scope and time; seeks trade secret or other confidential research, development or commercial information |
| 6. All documents reflecting any explanation by Intuitive Surgical for why Active Electrode Monitoring technology was not incorporated into Intuitive's Monopolar Curved Scissors. | Overbroad as to scope and time; seeks trade secret or other confidential research, development or commercial information |

Ex. 4 (emphasis added).

Requests 2, 4, and 5 specifically ask for technical information pertaining to surgical systems, instruments or versions of MCS not used in the Plaintiff's surgery, and only Topic 3 has any date limitation.

By letter dated October 31, 2016, ISI advised Encision that it intended to move to quash the topics or requests for documents in the subpoenas seeking confidential and proprietary

5

technical or business information relating to any instrument or line of robotic systems other than the 8mm line of MCS instrument sold in 2012 that were used in Mr. Pohly's surgery. (Bellamy Decl., Ex. 5.)

On November 2, 2016, counsel for ISI and Plaintiff conferred by phone. Defense counsel attempted to clarify whether the Topics and Requests referring to the "da Vinci robotic system" and "Monopolar Curved Scissors" were limited to the 8mm MCS line used in Mr. Pohly's surgery. (Leung Decl. ¶ 2.) Plaintiff's counsel confirmed that he was in fact seeking evidence pertaining to ISI's consideration or incorporation of AEM into other, non-8mm, product lines on the grounds that such information/document regarding other designs would be relevant to whether AEM was feasible to incorporate in the 8mm MCS (*Id.*) The parties were unable to reach an agreement regarding the scope of Plaintiff's Encision subpoena. (*Id.* at ¶ 3.)

## II.     LEGAL AUTHORITY

Plaintiff's claimed injuries allegedly arise from the use of the 8mm MCS for the *da Vinci* Si surgical system. ISI does not oppose Plaintiff's discovery of responsive information and documents dated prior to May 2013 pertaining to the 8mm MCS sold in 2012 if they are produced pursuant to an appropriate protective order entered in the Underlying Lawsuit. However, Plaintiff's requests for technical information pertaining to ISI's next generation systems and instrument lines are overbroad, not relevant to his claims, and should be modified to be limited to only the 8mm MCS at issue during the relevant time period, given the confidential, proprietary and commercially valuable nature of the subpoenaed information.

ISI respectfully requests that this Court modify the subpoenas to limit them only to ISI's 8mm product line.

6

### A. ISI Has A Right To The Subject Matter Of The Documents Requested In The Encision Subpoenas

The court for the district where compliance to a subpoena is required may, "on motion, quash or modify the subpoena if it requires (i) disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B)(i).

A party may challenge a third-party subpoena when the party has "a personal right or privilege with respect to the subject matter of the documents requested in the subpoena." *Furr v. Ridgewood Surgery & Endoscopy Ctr.*, LLC, No. 14-1011-RDR, 2014 WL 6472885, at *2 (D. Kan. Nov. 18, 2014); *see also Savant Sys. LLC v. Crestron Elecs., Inc.*, Civil Action No. 12-MC-51, 2012 WL 987404, at * 3 (E.D. Pa. Mar. 22, 2012) (conferring standing for defendant in antitrust lawsuit to move to quash plaintiff's subpoena to third party from producing defendant's documents produced to the third party in patent infringement and trade secret litigation with third party); *AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*, Civil Action No. RDB-08-3388, 2010 WL 1529195, at *5 (D. Md. Apr. 15, 2010) (holding defendant had standing to challenge non-party subpoena "because the documents that Plaintiffs seek include internal documents regarding [Defendant's] operations and technology").

As discussed in Part II.C., below, the documents subpoenaed by Plaintiff contain ISI's trade secrets and other confidential commercial information relating to the ongoing development of the Single-Port line. Therefore, ISI has standing to move the Court to modify Plaintiff's subpoenas to Encision in order to protect its trade secrets and/or other confidential research, development or commercial information.

### B. The Subpoenas Are Overbroad And Seek Irrelevant Information

Discovery is limited to materials and information that are "relevant to any party's claim or defense and proportional to the needs of the case, considering . . . the importance of the

7

discovery in resolving the issues." Fed. R. Civ. P. 26(b)(1); *see also Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993) ("[T]he potential for discovery abuse is ever-present, and courts are authorized to limit discovery to that which is proper and warranted in the circumstances of the case.").

When relevance is not apparent on the face of a request, the proponent of the discovery bears the burden of proving relevance. *Furr*, 2014 WL 6472885, at *3; *see also Katz*, 984 F.2d at 424–25 ("The district court correctly placed the burden on [Plaintiff] to establish a need for the breadth of the information sought . . . ."). To satisfy that burden, the proponent must provide more "than a theoretical argument that the requested information somehow relates to an action pending in another district." *DISH Network, L.L.C. v. WNET*, Civil Action No. 13-cv-00832-PAB-KLM, 2014 WL 1628132, at *5 (D. Colo. Apr. 24, 2014); *see also Monterey Bay Military Housing, LLC v. Pinnacle Monterey LLC*, No. C15-80123 HRL, 2015 WL 2229229, at *2-3 (N.D. Cal. May 12, 2015) (quashing subpoena in management fraud lawsuit to third party developer for its confidential business information regarding the costs of its property insurance on the grounds that requested discovery is not relevant because third party's insurance program is not similar to defendant's).

Because Plaintiff's Topics and Requests seek information and documents pertaining to documents beyond the relevant date range and pertain to products that weren't used in Plaintiff's Surgery, the relevance of the requested discovery is tenuous at best and out of proportion with the needs of the case.

1. **Post-May 2013 confidential information and documents relating to ISI's systems and instruments are not relevant to the state of technology available prior to Plaintiff Pohly's surgery.**

On their face, the deposition topics and document requests are overbroad because they are not limited to the relevant time period. Mr. Pohly's surgery occurred on July 31, 2012. Thus, any design choices ISI made after that date could have no bearing on his injuries. Furthermore, ISI implemented manufacturing process control improvements to address the microcracking issue and released a new MCS version beginning in June 2013. Thus – at the very latest, May 2013 is the end date for relevant design information pertaining to the MCS.

Because they do not contain any date limitation, Topics 1, 2 3, and 8 and Requests 1, 2, 4, 5 and 6 are overbroad and should be modified to limit discovery dated May 2013 and earlier.

2. **The confidential information and documents requested relating to ISI's next generation product line are not relevant to the feasibility design considerations for the 8mm MCS used in Mr. Pohly's surgery.**

ISI's Single-Port MCS differs from the 8mm MCS used in Plaintiff's surgery in multiple, significant mechanical and material aspects including diameter size, construction materials, wrist architecture, and use configuration. (Stoffel Decl. ¶ 8.) First, the two product lines differ in size. The 8mm instruments used in Plaintiff's surgery are 8mm in diameter while Single-Port instruments are 5mm in diameter. (*Id.* ¶ 9.) The shaft of the 8mm MCS used in Plaintiff's surgery is constructed out of a thick, non-conductive composite material with molded plastic extension tube, whereas the shaft of the Single-Port MCS is made from metal, in part due to the requirement for a significantly smaller outer diameter. (*Id.* ¶ 10.) The 8mm MCS has an articulating wrist, whereas the Single-Port MCS has a joggle joint that manipulates the distal end of the instrument by bending in two different places along the shaft. (*Id.* ¶ 11.) The wrist and blades of the 8mm MCS are one integrated active electrode unit, while the blades for the Single-

9

Port instrument are in a separate unit that protrudes from the joggle joint. (*Id.* ¶ 12.) Significantly, the 8mm MCS are used in a multi-port configuration – meaning that instruments are inserted into the patient's abdominal cavity through two or three incisions spaced around the patient's umbilicus so that they cross each other during surgery at angles. (*Id.* ¶ 13.) In contrast, Single-Port instruments enter the body together through one central port (as the name suggests) in a parallel formation. (*Id.*)

The multi-port 8mm MCS is designed with multiple layers of insulation for its conductor wire, including the thick non-conductive composite shaft that also provides its structural support. (*Id.* ¶ 14.) This design provides robust protection against the risks of leaking stray electricity from insulation failure or capacitive coupling.[2] (*Id.*) In contrast, the use configuration and size constraints for the Single-Port platform require the parallel delivery of laparoscopic instruments with conductive, metal shafts. (*Id.*) It is this combined set of conditions— not applicable to the 8mm line—that creates an increased risk of capacitive coupling, and that led ISI to enter into an agreement with Encision to explore AEM as a potential mitigator to reduce the risk of one energized Single-Port instrument inadvertently electrifying a second instrument in the same port. (*Id.*)

However, given the many significant differences in material, size, and architectural and electrical design, the functionality tradeoffs, technical difficulties encountered and design choices made for the Single-Port MCS have little to no bearing as to what would have been "feasible" (or even desirable) for the 2012 8mm MCS used in Mr. Pohly's surgery in light of the system constraints of the Si system.

---

[2]  Capacitive coupling is an electrical engineering phenomenon involving capacitors. In its simplest form, a capacitor is composed of two conductive elements in close proximity, separated by an air gap. If one of the two conductive elements of a capacitor is energized with high frequency alternating current such as for a monopolar cautery instrument, energy can travel, or "couple," across the air gap under certain conditions.

Because information and documents relating to the Single Port MCS under development have little probative value in resolving the issues concerning an entirely separate line of differently designed and constructed instruments for a different robotic system, the subpoenas should be modified to limit their scope only to information and documents concerning the 8mm MCS from May 2013 and before.

### C. The Subpoenas Improperly Seek Trade Secrets And Other Proprietary Information Of Little Relevance

Plaintiff's requests for licensing or development agreements, design drawings and other documents and information pertaining to ISI's technical evaluation and analysis and other information relating to ISI's next generation Single-Port line should also be modified because the requested documents and information constitute trade secret and/or other proprietary, commercially valuable information that derives its value from its secrecy.

The medical device industry is intensely competitive, and ISI would suffer harm if its trade secrets were widely disseminated. ISI is the technology leader in minimally invasive robotically-assisted surgery. (Bellamy Decl. Ex. 6, Intuitive Surgical, Inc., 2015 10-K, at 2.) As use of the *da Vinci* surgical system increases, numerous companies have introduced products in the field of robotic surgery or have made explicit statements about their efforts to enter the field: Auris Surgical Robotics Inc., Cambridge Medical Robotics Ltd, IMRIS Inc., Johnson & Johnson and Google Inc. and their joint venture, Verb Surgical Inc., MedRobotics Corp., meerecompany Inc., Medtronic PLC, Olympus Corp., Samsung Corporation, TransEnterix Inc., and Titan Medical Inc. (*Id.* at 11.) Other companies and research institutions have also begun research efforts to use computers and robotics in surgeries. (*Id.*)

Where the subpoenaing party fails to properly limit the scope of its subpoena such that the subpoena requires "disclosing a trade secret or other confidential research, development,

11

or commercial information" the court may quash or modify the subpoena. Fed. R. Civ. P. 45(d)(3)(B)(i). To qualify for protection under Rule 45(d)(3)(B)(i), the movant must show that the information is a trade secret or confidential commercial information and demonstrate that disclosure of the information might be harmful. *See R & D Bus. Sys. v. Xerox Corp.*, 152 F.R.D. 195, 198 (D. Colo. 1993) (quashing a third-party subpoena that sought information about, among other things, product research and development).

### 1. The confidential information and documents requested relating to ISI's next generation product line constitute trade secret or other confidential research, development or commercial information.

A trade secret is "commercial information relating to business which is secret and of value, and which the owner has treated confidentially." *R & D Bus. Sys.*, 152 F.R.D. at 197.[3] In *R & D Business Systems*, the party issuing the subpoena sought, among other things, information about research and development of the manufacturer's products. *Id.* The court held that the information being requested "took years to develop" and "was acquired at great financial cost." *Id.* Furthermore, the manufacturer took great efforts to keep the information confidential. *Id.* Thus, the court held that the information constituted trade secrets. *Id.*; *see also Heeney v. FDA*, No. CV 97-5461 MMM (CTx), 1999 WL 35136489, at *7 (C.D. Cal. Mar. 16, 1999) (upholding FDA's redactions of Boston Scientific's design and testing data from production to plaintiff desiring to use the information in products liability litigation, including specification of materials used in constructing the electrode catheter used in plaintiff's medical treatment because data reflected innovation and effort and fell "squarely within Exemption 4's reference to 'trade secrets.'")

---

[3] Both California and Colorado follow the Uniform Trade Secrets Act. See Cal. Civ. Code § 3426.1 (West); Colo. Rev. Stat. Ann. § 7-74-102 (West).

The Court should follow the same course here. ISI closely guards its research and development plans concerning its next generation da Vinci platform and instruments. (Stoffel Decl. ¶ 16.) ISI has invested years developing and testing the Single-Port line. (*Id.*) ISI's technical analysis and design drawings of its Single-Port system or instruments would be commercially valuable to companies seeking to develop robotic surgical instruments, who could gain a head start from the benefit of ISI's prior development efforts. (*Id. ¶¶* 16-17.) Additionally, ISI goes to great lengths to protect its product development efforts. ISI and Encision's work on the Single-Port line was subject to a confidentiality agreement providing for each party to treat the other party's proprietary technical information in trust and confidence. (Bellamy Decl. Ex. 2, at p. 16.) The agreement also provided that all proprietary information should be returned to the disclosing party upon completion or termination of the agreement. (*Id.*) Additionally, ISI requires every employee to sign a confidentiality agreement to protect its confidential information. (Stoffel Decl. ¶ 18.) Proprietary information is not disseminated more broadly than necessary for product development purposes, and employees are required to use passwords to access ISI files and follow other information security measures. (*Id.*) Finally, engineering areas are similarly secured with key cards, which are provided only to authorized employees. (*Id.*)

As discussed above, information about ISI and Encision's work on the Single-Port line constitutes trade secrets and/or other protectable confidential research, development or commercial information. Plaintiff's overbroad subpoena, to the extent they seek disclosure these trade secrets unrelated to products used in his July 31, 2012 surgery, should be quashed.

### III. CONCLUSION

Plaintiff's subpoenas seek information and documents concerning ISI product lines that were not used in Plaintiff's surgery and that are substantially different from those that were. Because the disputed discovery is of little importance to resolving the issues in the Underlying Lawsuit, and because the requested discovery seeks trade secrets that should be protected from disclosure, ISI respectfully requests that this Court modify the subpoenas to limit the deposition topics and document requests to information and documents dated prior to May 2013 pertaining to the 8mm MCS given the proportional needs of the case following the entry of a suitable Protective Order.

Dated:  November 9, 2016

Respectfully submitted,

*s/ Galen D. Bellamy*
Galen D. Bellamy
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado  80202
Telephone: (303) 244-1800
Facsimile:  (303) 244-1879
Email:    bellamy@wtotrial.com

***Attorneys for Defendant Intuitive Surgical, Inc.***